# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

EMANUEL HUEY SPENCE

    Applicant,

v.                             Case No. 8:15-cv-2805-T-23SPF

SECRETARY, Department of Corrections,

    Respondent.

_____/

## O R D E R

    Emanuel Huey Spence applies for the writ of habeas corpus under
28 U.S.C. § 2254 (Doc. 1) and challenges the validity of his state convictions for
burglary of a structure with assault with actual possession of a firearm, robbery
with a firearm, aggravated assault with a firearm, attempted robbery with a
firearm, aggravated assault, and trespass, for which convictions Spence serves
thirty years imprisonment. Numerous exhibits ("Respondent's Exhibit __")
support the response. (Doc. 11) The respondent admits the application's
timeliness.[1] (Doc. 11, p. 3)

## FACTS[2]

    Donna Sanchez was parked in front of a Bank of America branch during
her lunch hour when a green car carrying Spence and two other men pulled up

---

[1] Although afforded the opportunity, Spence filed no reply.

[2] This factual summary derives from Spence's brief on direct appeal. (Respondent's Exhibit 9)

"bumper to bumper" with her vehicle. Spence and another man exited the passenger side of their vehicle. Spence had his face partially covered with a t–shirt and was armed with a gun. Spence looked directly at Sanchez and went into the bank. The driver of the suspects' vehicle remained outside. Sanchez pulled up next to the suspects' vehicle and the driver pulled out a gun and pointed it at Sanchez, who fled the scene and called 911. Spence and his accomplice entered the bank where they ordered everyone to get on the floor. Spence entered a loan officer's cubicle and pointed his gun at a customer inside. Spence and his accomplice eventually fled the bank with cash. Spence was arrested and charged with burglary of a conveyance with a firearm (count one), grand theft (count two), burglary of a structure with an assault while armed with a firearm (count three), robbery with a firearm (count four), attempted felony murder (count five), attempted armed robbery (count six), aggravated assault (count seven), and trespass (count eight).

A jury convicted Spence of counts three through eight[3] for which he serves thirty years imprisonment.

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this application. *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th

---

[3] Spence successfully moved to sever counts one and two from the remaining charges. (Respondent's Exhibit 1, Vol. I, p. 50)

Cir. 1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *See White v. Woodall*, 572 U.S. 415, 427 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question . . . .") (citing *Richter*); *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) ("And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citing *Woodall*, 572 U.S. at 419). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given

-4-

effect to the extent possible under law." *Bell v. Cone*, 535 U.S. at 694. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Id.* "[T]he State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

In a *per curiam* decision without a written opinion the state appellate court on direct appeal affirmed Spence's convictions and sentences. (Respondent's

Exhibit 11)  The state appellate court affirmed the denial of Spence's Rule 3.850

motion for post-conviction relief.  (Respondent's Exhibits 17 and 23)  The state

appellate court's *per curiam* affirmance warrants deference under Section 2254(d)(1)

because "the summary nature of a state court's decision does not lessen the deference

that it is due."  *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc*

*denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003).

*See also Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state

court and the state court has denied relief, it may be presumed that the state court

adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary."), and *Bishop v. Warden*, 726 F. 3d 1243, 1255–56

(11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a

"decision" or "ruling" and explaining that deference is accorded the state court's

"decision" or "ruling" even if there is no "opinion" or "analysis").

As *Pinholster*, 563 U.S. at 181–82, explains, review of the state court decision is

limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the
> record that was before the state court that adjudicated the claim
> on the merits. Section 2254(d)(1) refers, in the past tense, to a
> state-court adjudication that "resulted in" a decision that was
> contrary to, or "involved" an unreasonable application of,
> established law. This backward-looking language requires an
> examination of the state-court decision at the time it was made. It
> follows that the record under review is limited to the record in
> existence at that same time, i.e., the record before the state court.

Spence bears the burden of overcoming by clear and convincing evidence a state court

factual determination.  "[A] determination of a factual issue made by a State court

shall be presumed to be correct. The applicant shall have the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

This presumption of correctness applies to a finding of fact but not to a mixed

determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert.*

*denied*, 534 U.S. 1046 (2001). The state court's rejection of Spence's post-conviction

claims warrants deference in this case. (Final Orders Denying Motion for

Post-Conviction Relief, Respondent's Exhibits 13 and 21)


## INEFFECTIVE ASSISTANCE OF COUNSEL

Spence claims ineffective assistance of counsel, a difficult claim to sustain.

"[T]he cases in which habeas petitioners can properly prevail on the ground of

ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d

1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th

Cir. 1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that

*Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of

counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*, first, the
> defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant
> must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose
result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Strickland* requires proof of both deficient performance and consequent

prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an

ineffective assistance claim . . . to address both components of the inquiry if the

defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When

applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two

grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance

and made all significant decisions in the exercise of reasonable professional

judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness

claim must judge the reasonableness of counsel's challenged conduct on the facts of

the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690.

*Strickland* requires that "in light of all the circumstances, the identified acts or

omissions were outside the wide range of professionally competent assistance."

466 U.S. at 690.

Spence must demonstrate that counsel's alleged error prejudiced the defense

because "[a]n error by counsel, even if professionally unreasonable, does not warrant

setting aside the judgment of a criminal proceeding if the error had no effect on the

judgment." 466 U.S. at 691S92. To meet this burden, Spence must show "a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Spence cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (*quoting Burger v. Kemp*, 483 U.S. 776, 794 (1987)). The required extent of counsel's investigation was addressed recently in *Hittson v. GDCP Warden*, 759 F.3d 1210, 1267 (11th Cir. 2014), *cert. denied sub nom., Hittson v. Chatman*, 135 S. Ct. 2126 (2015):

> [W]e have explained that "no absolute duty exists to investigate particular facts or a certain line of defense." *Chandler*, 218 F.3d at 1317. "[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066 (emphasis added). "[C]ounsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a

> nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." *Chandler*, 218 F.3d at 1318. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S. Ct. at 2538.

*See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (confirming that counsel has no duty to raise a frivolous claim).

Under 28 U.S.C. § 2254(d) Spence must prove that the state court's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Sustaining a claim of ineffective assistance of counsel is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 106. *See also Pinholster*, 563 U.S. at 202 (An applicant must overcome this "'doubly deferential' standard of *Strickland* and [the] AEDPA."), *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011) ("Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding."), and *Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim — which is governed by the deferential

*Strickland* test — through the lens of AEDPA deference, the resulting standard of review is "doubly deferential."), *cert. denied*, 134 S. Ct. 191 (2013).

In summarily denying Spence's motion for post-conviction relief, the state court recognized that *Strickland* governs a claim of ineffective assistance of counsel. (Respondent's Exhibits 13 and 21)  Because the state court rejected the claims based on *Strickland*, Spence cannot meet the "contrary to" test in Section 2254(d)(1).  Spence instead must show that the state court unreasonably applied *Strickland* or unreasonably determined the facts.  In determining "reasonableness," a federal application for the writ of habeas corpus authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry," not an independent assessment of whether counsel's actions were reasonable.  *Putnam v. Head*, 268 F.3d 1223, 1244, n.17 (11th Cir. 2001), *cert. denied*, 537 U.S. 870 (2002).  The presumption of correctness and the highly deferential standard of review requires that the analysis of each claim begin with the state court's analysis.

**Ground One**

In his sole ground for relief Spence contends that the trial court erred by denying his motion to suppress both the out-of-court identification and the in-court identification of Spence by witness Donna Sanchez.  The respondent opposes Spence's challenge to Sanchez's in-court identification as unexhausted and procedurally barred because Spence failed to raise this challenge in his direct appeal.

Out-of-court identification

Spence alleges that, because she saw pictures of the suspects in the newspaper on the morning after the crimes, Sanchez's out-of-court identification "was not based upon the witness's independent recollection of the suspect at the time of the crime but was influenced by the interviewing [sic] newspaper article." (Doc. 1, p. 3) Spence further alleges that "Detective [Eric] Outlaw employed an unnecessarily suggestive procedure when he brought the newspaper article to Ms. Sanchez to identify [Spence] instead of showing her a photo lineup or even a single photograph of the Petitioner without his name underneath the photograph." Spence claims that, despite the fact that the information in the newspaper article was provided by the Polk County Sheriff's Office, "[t]here was no explanation why Detective Outlaw did not conduct a photo lineup with another photograph without [Spence]'s name." (Id. at p. 4) Relying on *Neil v. Biggers*, 409 U.S. 188 (1972), Spence argues that Sanchez's out-of-court identification was both unnecessarily suggestive and "gave rise to a substantial likelihood of misidentification" because Sanchez "[1] had limited opportunity to view the perpetrators at the time of the crime[s] since their faces were mostly covered, [2] her attention was divided amongst the two subjects who exited the car and the driver, [3] Sanchez gave an inaccurate license tag of the vehicle, [4] her prior description of the subject was general and could have fit many subjects in the community, and [5] Sanchez viewed the photograph from the newspaper article with Detective Outlaw over two weeks after the offense." (Id. at pp. 4–5) Spence asserts that the trial court's

rejection of his motion to suppress deprived him of his constitutional right to due process. The state appellate court rejected this ground in Spence's direct appeal in a *per curiam* decision without a written opinion. (Respondent's Exhibit 4)

Sanchez testified at the suppression hearing that on the day of the crimes she went to the Bank of America to use the ATM during her lunch hour. While she was in her car, a green car carrying Spence and his accomplices pulled directly in front of her car and stopped. Two men with t-shirts covering the lower part of their faces exited the passenger side of the car. Although Sanchez "didn't get a very good look at the first person" who exited the car, she did "got a pretty good look" at the second man later identified as Spence (Respondent's Exhibit 1, Vol. I, transcript of February 6, 2009, suppression hearing, pp. 10–11):

> Q: And did you get a good look at the second person I guess that was out of the vehicle?
>
> A: I got a pretty good look at him. Yes.
>
> Q: What particularly did you get a good look at?
>
> A: His eyes. He had like, you know, just different eyes and then his hair and some of his clothing. Like he had on a light shirt and some dark pants . . . a light, you know, t-shirt like I said, like t-shirt looking kind of thing around his face kind of thing and like a generic kind of . . .
>
> Q: Did it cover his whole entire face?
>
> A: It didn't.
>
> . . . .
>
> Q: And how much . . . and again, how much of the face do you think you saw of this second . . . actually let me ask you

something first. Did you notice anything about the heights of the two guys that got out of the vehicle?

A: Yes. The first . . . well, it appeared that the first person into the bank was thicker, was like not necessarily taller but a thicker person going in . . . the first person. The second person was very lanky, like arms were real long, legs were real long, very lanky.

Q: And this is the individual where you believe you got a better look at their face?

A: Right.

Q: And how much of the face could you see?

A: You know, like probably this much . . . probably from the nose to the forehead.

. . . .

Q: So the area of the face that you could see, did you get a good look at that?

A: Yes.

Q: Good enough where you could . . . if you saw that face again you would be able to recognize it?

A: Yes. He has . . . he had very unique eyes and that's what I remembered mostly. They were just kind of . . . what I would describe as crazy eyes but just like very red and like one appeared to go one way you know, just . . . like they weren't . . . like your regular eyes, they weren't looking forward you know, at you. Because he looked right at me when he came out of the car . . . .

Q: Okay, so this individual . . . the second person, the taller, lankier one, he looked right at you?

A: Uh–huh.

Q: Did he turn his whole head . . . his whole body or what?

A: He was looking directly at m[y] face to, you know, face to face at me. Because when he came out of the car, the way that the driver's side . . . the passenger's side door opened, he like came out backward so his back was actually facing the passenger car.

> So his face . . . he was facing toward me when he came out and
> then he had to go around the door to go into the bank.

Sanchez testified that the day after the crimes she picked up her newspaper at her home and "immediately" noticed pictures of the driver of the green car and the second man that she saw go into the bank.  (Id. at pp. 15–16)  Sanchez testified that no one, including the police, told her to look at the newspaper article and that the police did not contact her to tell her the names of the perpetrators.  After seeing the pictures in the newspaper Sanchez contacted the detective with whom she had spoken the day before at the crime scene and alerted him that she recognized the perpetrators.  (Id. at pp. 19–20)  Approximately two and a half weeks later Detective Outlaw interviewed Sanchez.

Detective Outlaw testified at the suppression hearing that once he learned that Sanchez had seen the newspaper article, he obtained a copy of the article and "took that newspaper with [him] when [he] interviewed Ms. Sanchez for clarification purposes to make sure that [he] knew who she was talking about and so that she could indicate who she had seen do what."  (Id. at p. 37)  Detective Outlaw neither conducted a line-up nor presented Sanchez with a photopack from which to identify the perpetrators.  (Id. at p. 40)  He testified that he "wasn't aware that Ms. Sanchez had seen [the perpetrators] faces until she indicated she had seen them in the newspaper."  (Id. at p. 41)

The trial judge concluded that Spence had presented no basis to suppress Sanchez's out-of-court identification (Id. at pp. 43–47):

THE COURT: What did you hear that was illegal? Other than someone committed a bank robbery? What happened . . . what did the police do that was illegal?

[COUNSEL]: Your Honor, it's our position that the actions by Detective Outlaw created a situation where the out-of-court identification of Mr. Spence was imperceptibly tainted, irreparable . . .

THE COURT: Imperceptibly means it might as well not have ever happened.

[COUNSEL]: Impermissibly suggestive.

THE COURT: Impermissibly suggestive. Well, I would agree with you[] 100 percent if the woman called the police and asked the detective and said I don't know if I told you all this but I actually saw their faces. And he went and bought a copy of the Ledger and said, ["A]re these the guys?["] Why, yes. I'd throw that out in a New York minute.

[COUNSEL]: And that's exactly what happened.

THE COURT: No, that is not exactly what happened. That's what I'm trying to get across. If they had done that in a vacuum, I would suppress it. But here the undisputed evidence is that the woman saw the newspaper and said, my gosh, those are the guys I saw robbing the bank and called the police to say their pictures are in the paper. Under those circumstances, when the officer shows up with a copy of the newspaper in hand, is this the article you are talking about, is really the question. Not are these the guys. It becomes harmless in light of the fact it all was . . . initiated by the victim. What's your response to that? Or not victim, excuse me, eyewitness. What is your response to that?

[COUNSEL]: My response to that, Your Honor, is that she supposedly made that call on March the 17th and that means that law enforcement was aware on March the 17th that there was a potential identification made by Ms. Sanchez and that she thought that she had seen the suspect in . . . or the Defendant in the paper and they did not follow up and  . . .

THE COURT: Why would they need to? She says their pictures are in the paper. What else are they supposed to do?

[COUNSEL]: I think they're supposed to conduct a lineup or a photo pack . . .

THE COURT: You got a case that tells me the police are required to do a lineup or photo packs?

[COUNSEL]: The police are required . . .

THE COURT: Would you quit interrupting me? You got a case that says the police are required to do a lineup or a photo pack when somebody says the guy's picture is in the paper?

[COUNSEL]: Your Honor, the police are required to facilitate a non–suggestive . . .

THE COURT: They're required to do a lineup procedure?

[COUNSEL]: They're required to conduct . . .

THE COURT: When they do it they are required to do it in a non-suggestive manner. But they don't have to do it in the first place. Once you decide, I think I'm going to take some pictures over and show this person that was a witness to this crime and they put one black guy and five white guys and the black guy is wearing a jail uniform and the description was a black man, of course they're going to pick that picture. Or if they get . . . people of all the same race, they're different ages or people all the same race and age but different sizes. And you know they have to more or less present them with pictures of a number of people who look superficially alike.

. . . .

If they don't do that then maybe in certain circumstances be [sic] suggestive. So the point is when they elect to do this type of procedure, it must not be suggestive. But you're saying they didn't even elect to do any sort of lineup. And my question is, what says that they have to?

[COUNSEL]: When they are relying on how the information came to them to support the identification, Your Honor . . .

THE COURT: So you are saying to me, if I heard you correctly, that they have to do a lineup when somebody says they can identify one of the suspects?

[COUNSEL]: I'm saying that they are required to do an unsuggestive, unbiased method to confirm the identification. In this circumstance the identification was made from a newspaper with an article that said these were the people . . .

THE COURT: Before the cop ever showed up this was done. The suppression hearing is directed a[t] police illegality.

[COUNSEL]: And it's . . .

THE COURT: Okay whatever.

[COUNSEL]: It's my position, Your Honor, that the police actions were illegal.

THE COURT: They were not. This is one of the most pointless motions to suppress I've ever litigated. State[,] do a motion and an order denying it.

A defendant possesses a due process right to exclude identification testimony resulting from an unnecessarily suggestive identification procedure that was conducive to an irreparably mistaken identification. *Manson v. Brathwaite*, 432 U.S. 98, 104 (1977); *Stovall v. Denno*, 388 U.S. 293, 301–02 (1967). A suggestive identification procedure, without more, results in no due process violation. *Biggers*, 409 U.S. at 198–99. Rather, to violate due process the identification procedure must unnecessarily suggest a suspect and create a substantial risk of misidentification. *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir.1987). "Reliability is the linchpin in determining the admissibility of identification testimony . . . ." *Brathwaite*, 432 U.S. at 114. "Factors to be considered in determining whether the identification was reliable include: (1) opportunity to view; (2) degree of attention; (3) accuracy of the description; (4) level of

certainty; and (5) length of time between the crime and the identification." *United States v. Diaz*, 248 F.3d 1062, 1102 (11th Cir. 2001) (citing *Biggers,* 409 U.S. at 199).

"The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct." *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012). Spence establishes no impermissibly suggestive identification procedure by law enforcement. Even assuming that Detective Outlaw showing the newspaper article to Sanchez was an unduly suggestive identification procedure, her identification of Spence was nonetheless reliable. Sanchez had an unobstructed view of Spence on a clear day in broad daylight when he looked directly at her after exiting the car parked "bumper to bumper" with her vehicle. Sanchez accurately described Spence's build and eyes. The day after the crimes, without any involvement or prompting from law enforcement, Sanchez independently and unequivocally recognized Spence as one of the bank robbers and contacted law enforcement of her own initiative. *See Biggers*, 409 U.S. at 199. Consequently, Spence establishes no basis to suppress Sanchez's out-of-court identification. Spence fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting his claim challenging the trial court's denial of his motion to suppress Sanchez's out-of-court identification.

In–court identification

Spence argues that the trial court erred at trial by admitting evidence of Sanchez's in-court identification. He contends that "[t]here is no indicia of the reliability to support an independent basis for Sanchez's courtroom identification." (Doc. 1, p. 5) Spence argues that, because Sanchez "had limited opportunity to observe the men who exited the car with their faces covered with a t-shirt, her attention was divided between the three subjects she observed, and she provided a vague and general description that could fit many black males, . . . it was error to allow the in-courtroom identification of Petitioner." (Id.)

The respondent argues that this claim is procedurally barred from federal review. Spence raised this allegation for the first time in his direct appeal brief. The state responded that the claim was not cognizable on appeal because Spence failed to preserved the claim at trial. (Respondent's Exhibit 3, pp. 19–20) The state appellate court affirmed Spence's convictions and sentences in a *per curiam* decision without discussion. (Respondent's Exhibit 4) Even though the state appellate court was silent as to its reason for affirming Spence's convictions and sentences, this court assumes that the state court observed the applicable procedural bar. *See Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993) (holding that a federal court "may not assume that had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of [the] case . . . . In fact, the most reasonable assumption is that had the state court ruled, it would have enforced the procedural bar."); *Kight v.*

*Singletary*, 50 F.3d 1539, 1544 (11th Cir. 1995) (recognizing that under Florida law, "a claim not objected to at trial is not preserved for appeal and cannot be raised in a postconviction proceeding"). Spence's failure to comply with Florida's preservation rule is an independent and adequate basis for the state appellate court's rejection of the claim and renders the claim procedurally defaulted for purposes of federal habeas review.

Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, an applicant "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, an applicant must demonstrate not only that the error at his trial created the possibility of prejudice but that the error worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimension. *United States v. Frady*, 456 U.S. 152 (1982). In other words, an applicant must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892.

Without a showing of cause and prejudice, an applicant may obtain federal habeas review of a procedurally defaulted claim only if review is necessary to correct a

fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000);

*Murray v. Carrier*, 477 U.S. 478, 495-96 (1986). A fundamental miscarriage of justice

occurs in an extraordinary case if a constitutional violation has probably resulted in the

conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327

(1995); *Henderson*, 353 F.3d at 892. This exception requires an applicant's "actual"

innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). To meet the

"fundamental miscarriage of justice" exception, Spence must show constitutional error

coupled with "new reliable evidence — whether . . . exculpatory scientific evidence,

trustworthy eyewitness accounts, or critical physical evidence — that was not

presented at trial." *Schlup*, 513 U.S. at 324. This standard "ensures that [the

applicant]'s case is truly 'extraordinary,' . . . while still providing [the applicant] a

meaningful avenue by which to avoid a manifest injustice." *Id.* at 327 (internal

citation omitted).

Spence fails to demonstrate cause and prejudice excusing his default. *Carrier*,

477 U.S. at 495–96. He cannot meet the "fundamental miscarriage of justice"

exception because he presents no "new reliable evidence" that he is actually innocent.

*Schlup*, 513 U.S. at 327. Because Spence satisfies neither exception to procedural

default, his challenge to the in-court identification is procedurally barred from federal

review.

Notwithstanding the default, the claim fails on the merits. Sanchez did not

identify Spence in court during the trial. Rather, Sanchez testified about her out-of-

court identification of Spence from the newspaper article. Neither the prosecutor nor trial counsel asked Sanchez to identify Spence in the courtroom during the trial.[4]

Accordingly, Spence's application for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk must enter a judgment against Spence and close this case.

### DENIAL OF BOTH
### A CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL IN FORMA PAUPERIS

Spence is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a COA, Spence must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues she seeks to raise. See 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Spence is entitled to neither a COA nor leave to appeal *in forma pauperis*.

---

[4] The respondent notes that Spence in his direct appeal brief argued that the police employed an improper identification procedure by issuing a press release that included the pictures seen in the newspaper by Sanchez. Although he does not delineate this claim in the federal application as an independent claim of trial court error, even if he did, Spence cannot obtain relief because the claim was not preserved in the trial court. Spence raised this allegation for the first time in his appellate brief. This omission renders the claim procedurally defaulted. Spence satisfies neither the cause and prejudice exception nor the fundamental miscarriage of justice exception to overcome the default. *Smith*, 256 F.3d at 1138; *Schlup*, 513 U.S. at 327. Alternatively, the claim fails on the merits because Spence fails to establish that the issuance of the press release amounts to improper police conduct.

Accordingly, a certificate of appealability is **DENIED**.  Leave to appeal *in forma pauperis* is **DENIED**.  Spence must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on December 26, 2018.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE